In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-07-005 CR


NO. 09-07-006 CR


NO. 09-07-007 CR


 ______________________



MARK ANTHONY MAYFIELD, Appellant 



V.



THE STATE OF TEXAS, Appellee


 




On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Court Nos. 86788, 87664, 97234






MEMORANDUM OPINION


 Pursuant to plea bargain agreements, Mark Anthony Mayfield pled "no contest" in
2003 to two offenses of possession of a controlled substance (codeine and cocaine). The trial
court deferred adjudication of guilt in each case and placed Mayfield on unadjudicated
community supervision. 

 In motions to revoke, the State alleged Mayfield violated the community supervision
orders by committing the offense of assault on a public servant in 2006. The State indicted
Mayfield for the offense. The trial court heard the revocation motions contemporaneously
with the trial on assault on a public servant. Mayfield pled "not true" to the alleged violation
of each community supervision order and "not guilty" to the assault-on-a-public-servant
offense. After the jury found Mayfield guilty of the assault offense, the trial court
adjudicated him guilty in each of the possession offenses. At the conclusion of the
punishment hearing, the trial court sentenced Mayfield to two years in the state jail in cause
number 87664 (possession of cocaine), five years in the institutional division in cause
number 86788 (possession of codeine), and eight years in the institutional division for assault
on a public servant. The judgments contained stacking orders. Mayfield appealed each
conviction.

 Appellate counsel filed briefs that concluded there was no arguable error in these
appeals. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967);
High v. State, 573 S.W.2d 807 (Tex. Crim. App. 1978). We granted Mayfield an
extension of time in which to file pro se response briefs. Mayfield did not respond. After
conducting an independent review of the record, we concluded there were arguable issues
for an appeal and ordered appointment of new counsel. See Stafford v. State, 813 S.W.2d
503, 511 (Tex. Crim. App. 1991). After our order issued, the trial court entered a
judgment nunc pro tunc in each case that corrected the stacking order in the judgments. (1) 
 Retained counsel filed a brief that raised two issues. Appellant contends the evidence is
insufficient to support his conviction for assault on a public servant, and argues the
motions to revoke should not have been granted in the possession cases. We affirm the
conviction for assault on a public servant. We dismiss the appeals in the possession
offenses. 

Assault on a Public Servant


 The assault-on-a-public servant offense occurred at a correctional facility. Jessikay
Johnson was a correctional officer working the 10:00 p.m. to 6:00 a.m. shift at the facility. 
Her duties involved making security checks, "[w]alking the dorms and ensuring that all
. . . inmate traffic cease[d]" for the night. All inmates were to be lying down with the
exception of going to and from the bathroom. "Everyone was supposed to be asleep." 
Johnson's desk was in front of the restroom wall. A "big gray industrial size trash can"
that weighed approximately ten pounds was in the room. Inmate Mayfield, with whom
Johnson had no prior interaction, went to the restroom at approximately 11:30 or 11:45
p.m. Although he was supposed to lie down when he returned, Mayfield sat up on his bed. 
Johnson testified she asked him why he was not lying down. He responded, "Oh, I just
got something on my mind[.]" She indicated Mayfield did not seem confused or dazed. 
When she asked him to lie down, he did so, and she went back to her desk. Johnson
testified, "I had not a least bit of suspicion that there was something wrong with him." He
did not tell her he was unwell; he did not appear to be intoxicated with any substance; and
he appeared to be oriented to his surroundings. There was no confrontation -- "[n]o words
exchanged or anything[,]" no warning at all. Johnson indicated she had training and
experience with inmates with psychiatric or psychological problems; she saw none in
Mayfield. 

 Johnson continued her security checks and walked among the bunks. She testified,
"He was just lying there. . . . I saw that he wasn't asleep, but he wasn't bothering anybody. 
He wasn't being disruptive; so, I didn't bother him." Around 2:00 a.m., Mayfield again
went to the restroom. While Johnson was on the phone with another officer, she saw
Mayfield come out of the restroom. Johnson stated, "[H]e grabbed the big gray industrial
trash can and threw it at me." The can struck and injured her left shoulder. Mayfield then
came up to her desk, shoved her against the file cabinet, and caused her to injure her other
shoulder. He began to "throw punches," and she "managed to block all but one." 

 Rushing to assist her, other inmates grabbed Mayfield and pulled him back into the
bunk area. Johnson testified Mayfield told the inmates, "Man, she was tripping. She was
fronting on me." She explained that "fronting" means "[p]utting someone out there in
front of a whole lot of people. Pretty much embarrassing them." Officers then arrived to
assist her. Johnson testified Mayfield stated, "Yeah, I did it. It wasn't nobody but me. 
Ain't nobody touch her. I did it." 

 Weston Slaughter, a correctional officer, testified he was working the night of
March 13. He heard Officer Johnson call for back-up help. By the time Slaughter arrived,
Mayfield was standing by his bunk, and the other inmates were lying down. Slaughter
testified Mayfield confessed that he assaulted Officer Johnson.

 Lieutenant Eiselstein, Johnson's supervisor, arrived on the scene and observed
Mayfield in handcuffs. In speaking with Mayfield, Eiselstein did not observe any
confusion, dazed state, or unsteadiness on Mayfield's part.

 The crux of Mayfield's argument appears to be a legal and factual sufficiency
challenge to the evidence supporting the conviction for assault on a public servant. (2) The
elements of assault on a public servant are: (1) a person (2) intentionally, knowingly, or
recklessly (3) caused bodily injury to another (4) who the person knew was a public
servant (5) while the public servant was lawfully discharging an official duty, or in
retaliation or on account of an exercise of official power or performance of an official
duty as a public servant. Tex. Pen. Code Ann. § 22.01(a)(1), (b)(1) (Vernon Supp.
2008); (3) Ortega v. State, 171 S.W.3d 895, 899 (Tex. Crim. App. 2005). 

 Mayfield argues he did not have the culpable mental state necessary to be convicted
of the offense, because the Dilantin prescribed for him following a seizure left him unable
to control himself and rendered his conduct involuntary. Under section 6.01 of the Texas
Penal Code, a person "commits an offense only if he voluntarily engages in conduct,
including an act, an omission, or possession." Tex. Pen. Code Ann. § 6.01(a) (Vernon
2003). 

 On March 8, 2008, Mayfield had a seizure in the jail. Nurse Wade described his
condition as "dazed and confused, which is normal after a seizure." While in the
infirmary, Mayfield told Nurse Wade that he did not take any medication and his last
seizure was a "year before. . . ." She explained the doctor was called, and he prescribed 
400 milligrams of Dilantin. Mayfield began taking Dilantin on March 8 and continued
taking it through March 12. He initially received 1,000 milligrams of Dilantin over a four-hour period. The dose was then reduced to 300 milligrams per day. After Mayfield was
returned to the dorm on March 10, he received two doses, one on the 11th and one on the
12th. After the March 13 attack on Officer Johnson, Mayfield refused his medication.

 Joshua Jacobs, Mayfield's lifelong friend, testified Mayfield had a history of
seizures and was originally prescribed Dilantin. Jacobs testified that "[w]hen [Mayfield]
started [D]ilantin he changed. It wasn't him." "Like it made him angry. . . . He wasn't
himself." Jacobs indicated Mayfield did not seem to be in touch with reality when he was
taking Dilantin. "[W]hen he got on the Dilantin, he wouldn't say nothing. He just sit there
and wouldn't say nothing." "And, when they changed his medicine, he was back to
himself. . . ." Jacobs indicated he never knew Mayfield to be violent. Jacobs
acknowledged he did not know Mayfield's condition at the time of the alleged assault. 

 Irvrie Williams, Jr. testified he had been incarcerated in the jail from September
to November 2005. Williams, who was already taking Dilantin when he entered the jail, 
alleged the jail's nursing staff gave him too much Dilantin. The side effects he
experienced were hallucinations and "bad" nerves. He indicated he never saw a doctor
when he was in the jail.

 Mark Mayfield testified he has had a seizure disorder since around 2000. Initially
prescribed Dilantin, he took the medication for a year or two. Mayfield testified he had
explained to his doctors that when he was taking Dilantin, he had mood swings and he did
not act like himself. As a result, his doctors prescribed phenobarbital. He explained he
has no mood swings or any other side effect from this medication.

 Mayfield indicated that upon admission to the jail in March 2006, there was no jail
interview to find out his medical history, and the nurses never attempted to obtain his
medication history. He denied telling the medical personnel at intake that he had a seizure
disorder, and he stated that no one asked him about it. Mayfield stated he never saw or
spoke to a doctor while he was in the infirmary. He testified he told the medical personnel
he did not want to take Dilantin. He indicated that although the nurses had the
phenobarbital "right there" beside the Dilantin, he was given the Dilantin rather than the
phenobarbital. Mayfield maintained that he is not a violent person, and he did not try to
hit Johnson or hurt her in any way. Mayfield stated "I didn't know." He explained that
Lieutenant Eiselstein's and Nurse Wade's testimony that he appeared and acted normal
was incorrect.

 Sheree Wade, R.N., a nurse at the facility, testified that, as part of the jail's normal
procedure, Mayfield's medical history was taken at his book-in. She explained that the
medical records indicate he had "a history of seizures[.]" She also indicated that the
medical records do not reflect he was disoriented or confused at the time of book-in.

 Nurse Wade testified that an overdose of Dilantin would manifest itself in
dizziness, drowsiness, slurred speech, disorientation, and imbalance. Wade explained she
had an opportunity to observe Mayfield from March 8, when he had the seizure, until he
was transferred back to the dorm. His demeanor and behavior were "normal" and "fine"
during his infirmary stay. In her opinion, he was not laboring under any kind of overdose
or toxicity to the Dilantin during that time, although she stated she could not know what
was going on in his mind. Wade indicated the transfer was based on an evaluation that
Mayfield was fit and capable to return to the general population.

 In a legal sufficiency review, we consider the evidence in the light most favorable
to the prosecution to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Unless otherwise provided by law, the
trier of fact is the sole judge of the facts proved and of the weight to be given the
testimony. Tex. Code Crim. Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon
1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); see also Lancon
v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) ("Appellate courts should afford
almost complete deference to a jury's decision when that decision is based upon an
evaluation of credibility."). We resolve any inconsistencies in the evidence in favor of the
verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (citing Moreno v.
State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). 

 In a factual sufficiency review, we consider the evidence in a neutral light. Roberts
v. State, 220 S.W.3d 521, 524 (Tex. Crim. App.), cert. denied, 128 S.Ct. 282, 169 L.Ed.2d
206, 76 U.S.L.W. 3165 (2007). We ask whether the evidence supporting the conviction,
although legally sufficient, is so weak that the fact-finder's determination is clearly wrong
and manifestly unjust, or whether conflicting evidence so greatly outweighs the evidence
supporting the conviction that the fact-finder's determination is clearly wrong and
manifestly unjust. Id. 

 A defendant's intent may be inferred from his words, acts, and conduct. Patrick
v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). "Intent" and "knowledge" are fact
questions for the jury and are usually proven through the evidence of the circumstances
surrounding the crime. Childs v. State, 21 S.W.3d 631, 635 (Tex. App.--Houston [14th
Dist.] 2000, pet. ref'd) (citing Robles v. State, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). 
 In this record, proof of intent and knowledge is found in the testimony of various
witnesses, including Mayfield, Nurse Wade, Officer Johnson, and Lieutenant Eiselstein. 
The jury could have inferred Mayfield knew what he was doing and intended to strike
Johnson with the trash can because she embarrassed him when she asked him (pursuant
to dorm procedure) to lie down after he returned from the bathroom. Johnson testified that
when the other inmates asked Mayfield why he attacked her, Mayfield explained she had
"fronted' him. Nurse Wade testified Mayfield appeared normal while he was taking the
Dilantin in the infirmary from March 8 to March 10 and prior to the assault on March 13. 
Lieutenant Eiselstein spoke with Mayfield shortly after the incident that night and found
no confusion, dazed state, or unsteadiness on Mayfield's part.

 In contrast, Mayfield's friend, Joshua Jacobs, testified Mayfield was not himself
when he took Dilantin a few years ago, and Mayfield explained that he did not remember
anything regarding the alleged assault on a public servant. A former inmate testified the
nurses at the jail facility had given him too much Dilantin some time in the past.

 Viewing the evidence in the light most favorable to the prosecution, a rational trier
of fact could have found the essential elements of the crime (including the culpable mental
state) beyond a reasonable doubt. Considering all the evidence in a neutral light, we
conclude the evidence supporting Mayfield's conviction is not so weak that the fact-finder's determination is clearly wrong and manifestly unjust, and the conflicting evidence
from Mayfield, Jacobs, and Williams does not so greatly outweigh the evidence
supporting the fact-finder's determination. The evidence is sufficient, both legally and
factually, to allow the jury to infer that Mayfield intentionally or knowingly committed the
offense of assault on a public servant. 

 Mayfield predicates our consideration of issue two on our sustaining issue one;
however, we have overruled issue one and affirmed the judgment of conviction in the
assault-on-a-public-servant offense. In any event, Mayfield was adjudicated guilty before
the effective date of the 2007 amendment to article 42.12, section 5(b) of the Code of
Criminal Procedure, (4) and he may not appeal from the trial court's determination to
adjudicate guilt. See Davis v. State, 195 S.W.3d 708, 710-12 (Tex. Crim. App. 2006). 
Because Mayfield's issue two relates to the trial court's determination to adjudicate guilt
in the drug possession cases, we do not have jurisdiction to address issue two. 

 The judgment of conviction in trial cause numbers 97234 is AFFIRMED. The
appeals in trial cause numbers 86788 and 87664 are DISMISSED.


 _________________________________

 DAVID GAULTNEY

 Justice 

 
Submitted on October 30, 2008

Opinion Delivered November 19, 2008 

Do Not Publish


Before Gaultney, Kreger, and Horton, JJ.
1. In addition to an issue concerning the stacking of the sentences, we questioned
whether, upon adjudication of guilt, the punishment assessed by the trial court for the codeine
offense was within the allowable range of punishment for the offense to which Mayfield
originally pled guilty. Appellant's retained counsel on appeal has not raised this issue. The
record reflects the trial court questioned the original plea in the cocaine possession case; the
pleas in both possession cases were subsequently changed to "no contest" pleas; the trial
court placed Mayfield on deferred adjudication community supervision in each case; and the
trial court admonished Mayfield that if "you break a condition of supervision, . . . you could
then be found guilty in each case and then be assess[e]d the maximum punishment that the
law allows for each indictment."
2. Mayfield presents various other arguments. For example, he asserts the State did not
inform the jury of certain crucial evidence. However, the record contains the referenced, or
similar, evidence. Moreover, his attorney was free to offer evidence that Mayfield deemed
important to his defense for the trial court's admissibility consideration. Mayfield argues the
jury should have been informed concerning the side effects of Dilantin, and he attaches
various articles to the appellate brief. Because the articles are not contained in the record,
we cannot consider them. See Whitehead v. State, 130 S.W.3d 866, 872 (Tex. Crim. App.
2004). Mayfield also contends the State should have called an expert to testify about Dilantin
and its effect on a defendant's culpability. It is not the State's burden to put on the
defendant's case. Mayfield also appears to assert that the medical personnel were negligent
in giving him large doses of Dilantin; however, any alleged negligence is beyond the scope
of the appeal of his criminal conviction. 
3. Although the assault-on-a-public-servant offense occurred before the 2007
amendment to section 22.01(b), we cite to the current statute, because the amendment has no
bearing on this appeal.
4. See Act of May 28, 2007, 80th Leg., R.S., ch. 1308, § 5, 53, 2007 Tex. Gen. Laws
4395, 4397, 4413 (current version at Tex. Code Crim. Proc. Ann. art. 42.12 § 5b (Vernon
Supp. 2008)).